MARY E. CARTALL v. ST. LOUIS UNION TRUST COMPANY, a Corporation, as Executor of the Estate of OTTO M. CARTALL; and MASONIC HOME OF MISSOURI, a Corporation, Appellants.—153 S. W. (2d) 370.

Division Two, July 25, 1941.

*Jacob M. Lashly* and *Lashly, Lashly, Miller & Clifford* for Masonic Home of Missouri; *Bryan, Williams, Cave & McPheeters* for St. Louis Union Trust Company.

*Clarence T. Case, David W. Voyles* and *T. Jackson Case* for re-spondent.

378

BOHLING, C.—Mary E. Cartall, widow of Otto M. Cartall, seeks a judgment decreeing her to be the owner of 128, face value $64,000, Dorothy Apartment Company notes, dated as of September 1, 1935, and due September 1, 1945, and 7, face value $3500, New Clemens Realty Company notes, dated as of April 1, 1933, and due April 1, 1943, 7 shares of no par value common stock of said New Clemens Realty Company, and directing the delivery of the same to her by the coexecutor of her deceased husband's estate. This, on the theory, basically, of a gift *inter vivos* to her by her husband. All notes are $500, 6% mortgage notes, payable to bearer. The evidence established that deceased left only current bills; that his debts, with the exception of an immaterial item, had been paid at the time of trial, and that the securities involved had a value well in excess of $7500. St. Louis Union Trust Company and Masonic Home of Missouri, corporations, coexecutor with plaintiff and residuary lega-

tee, respectively, under Mr. Cartall's will, appeal from a judgment in favor of plaintiff. They contend the evidence failed to establish certain constitutive elements of a valid gift *inter vivos*; among other things, a valid delivery and acceptance. We shall refer ▆▆▆ to the makers of the notes as Dorothy and New Clemens.

The issue involving a gift *inter vivos* may be concisely framed— may notes payable to bearer found, without any identification marks, in her husband's safe deposit box after his death be held to have been delivered so as to perfect a gift *inter vivos* by the husband to the wife, there being no actual delivery, by reason of declarations of the husband to third parties (a self-constituted paying agent) that they were the wife's property, the listing of the notes, for convenience, on the records of said paying agent in the wife's name, the issuance of interest checks in the wife's name by said paying agent, the wife's and husband's endorsements of said checks and the retention of the interest money by the husband, when the gift is first asserted by the wife (who did not know of the gift during the husband's lifetime) after his death—but a proper development of the wife's contentions calls for a detailed statement of the transactions. The case has been exceptionally well presented.

Otto M. Cartall, who gave every indication of previous good health, "dropped dead" in downtown St. Louis on December 18, 1936. He and plaintiff had lived as husband and wife since their marriage in 1911. There were no children. Mr. Cartall, a full partner in the firm of Kessler, Cartall & Company of St. Louis, certified public accountants, had been an active and successful business man, and had accumulated an estate appraised at $226,499.64, entirely of personal property. The Dorothy and New Clemens notes are included in the inventory of his estate and are in the possession of plaintiff's coexecutor.

Plaintiff had no business education and never acquired by inheritance, gift or otherwise a separate estate, property or independence, except what came to her or will come to her from her husband.

Mr. Cartall's will, duly admitted to probate January 5, 1937, was executed on October 3, 1931. The issues and the existing circumstances do not call for its detailed provisions. So far as material, after bequeathing his household furniture, books, clothes, jewelry and like effects to plaintiff, Otto M. Cartall willed the residue of his estate to plaintiff and the St. Louis Union Trust Company, as cotrustees, with power, to manage, control, invest, reinvest, etc., and named plaintiff as the beneficiary of the net income of said trust estate; vesting in the trustees, in their discretion, the privilege of encroaching upon the corpus of the trust estate from time to time for such amounts as they might deem necessary for the proper maintenance and support of plaintiff; protecting said trust estate and the income against the claims of creditors and the anticipation of the proceeds by the bene-

ficiary, and making the provisions of the will in lieu of plaintiff's marital rights. The will further provided that upon the death of plaintiff the trust should terminate and the then trust estate should pass to the Masonic Home of Missouri, codefendant.

The Chouteau Trust Company, of St. Louis, Missouri, the named trustee in a number of deeds of trust securing evidences of debt of various apartment corporations, including the Dorothy and New Clemens, closed its doors in 1933 and became incapacitated to act as trustee. The circuit court appointed Otto M. Cartall successor trustee for practically all the issues in St. Louis. Most of the securities were in default. The noteholders of the various issues were brought together, one after another, and elected a "bondholders' committee," with E. G. H. Kessler (Mr. Cartall's partner in the accounting business) as chairman to do the active work. Mr. Kessler also acted as president for practically all of the interested corporations. The Dorothy and New Clemens notes, among others, were deposited with the bondholders' committee pending refinancing. The Apartment Management Company also was organized to manage the properties, collect the rents, distribute the interest and keep track of the securities. E. W. Colbrunn was the treasurer and general manager and acted in a clerical capacity for the bondholders' committee. Eventually the Dorothy and New Clemens reorganizations were effected by the bondholders' committee. The Dorothy Apartment Company and the New Clemens Realty Company were organized to take title to the respective properties. New notes and new deeds of trust, executed and recorded, were exchanged for the old notes and deeds of trust, released of record.

At the time of his appointment as substitute trustee or soon thereafter, Mr. Cartall held securities secured by deeds of trust on a number of apartment properties, including the Dorothy, New Clemens, Winston Churchill, Trenton, Concord, Solar, Norwalk, and Enright issues. He desired to consolidate his investments of this nature. He mentioned this to Mr. Kessler and Mr. Colbrunn. By offering a premium to induce Dorothy noteholders to exchange, he, with the assistance of Messrs. Kessler and Colbrunn, acquired $64,000 of the outstanding $70,000, face amount, of the Dorothy old notes pending the refinancing.

To facilitate the handling of the several note issues (the notes were payable to bearer, were not registered and no provision in the notes or deeds of trust looked to their registration) in which the bondholders' committee was interested, the Apartment Management Company made up lists of the holders. Said lists reflect what Mr. Colbrunn was told. When informed of the transfer of a security, the old name on the list would be inked out and the new name written above the old. The exhibit of the security was never required. Lists of the Dorothy and New Clemens noteholders were introduced. Plaintiff's Exhibit 13 was the Apartment Management Company's list of

the Dorothy new noteholders and carried the following: ''Mary E. Cartall (128) 4023 Magnolia Place.'' Mr. Colbrunn testified it was typed prior to the issuance of the interest checks on the Dorothy new notes. Throughout it is an original typewritten copy, indicating no change therein up to the date of trial, March 21, 1939. Defendants' Exhibit 9 consists of seven sheets of paper. Mr. Colbrunn testified that defendants' Exhibit 9 was the remainder of the list of which plaintiff's Exhibit 13 was a part; that it was impossible to set a date on said Exhibit 9 other than that it came into existence after the first of 1933. We shall not detail defendants' Exhibit 9. It included earlier lists of the holders of Dorothy notes, giving the note numbers. A close study of its sheets in the light of the record does not aid plaintiff's case. Mr. Colbrunn testified that, for the purpose of having him assist in acquiring Dorothy notes, Mr. Cartall delivered to him $6500 Enright, $2000 Winston Churchill; $11,000 New Clemens; $1500 Solar and $500 Norwalk; and that in acquiring the $64,000, face amount, of Dorothy notes, they exchanged notes listed in Mr. Cartall's name and notes listed in plaintiff's name.

Mr. Kessler did not recall discussing the New Clemens issue with Mr. Cartall; but testified, speaking of the Dorothy issue, that Mr. Cartall ''meant to give these bonds to his wife. I couldn't help but know;'' that he had heard Mr. Cartall tell Mr. Colbrunn to pay the interest on the Dorothy bonds to plaintiff; that this occurred the first time that interest was paid after the distribution of the new notes [May, 1936]; that Mr. Cartall said: ''I'll give these bonds to my wife.''

Mr. Colbrunn testified, with respect to the Dorothy notes, that Mr. Cartall told him they were his wife's, he said: ''Put them in the name of Mary E. Cartall;'' that after Mr. Cartall acquired the 128 Dorothy notes, witness said: '' 'Mr. Cartall you have got many bonds according to our list that stand in your name and some in your wife's name,' and, I said, 'Now, whose bonds are these Dorothy bonds?' He said to me, 'I want them in the name of Mary E. Cartall.' I said, 'All right.' I fixed up this list then and that is how that name come on that list. Then when the January, 1936, interest was payable I called him on the telephone and I said, 'Mr. Cartall, we are going to pay interest on the Dorothy. Who gets this interest money?' and he said, 'Make that to Mary E. Cartall, they are her bonds.' And I did. And the next time the interest was payable, in July of 1936, for some unknown reason, I have no reason to offer why I did, but I remember it as if it happened yesterday, I called him again. I said, 'Mr. Cartall, we are going to pay the Dorothy interest. Who shall I make the check to?' and he had about enough of it, I guess; and got kind of mad and he said, 'I don't know what I have to do to make you people understand out there,' he said 'Those are' my wife's bonds. Now, for heaven's sake, put them in her name

and don't bother me about them; pay the interest to her. That should be final.'" He testified the first time Mr. Cartall told him to do this was in 1935, when he made up plaintiff's Exhibit 13; the second time was when the first interest was paid in May, 1936, and again when the interest was paid in July, 1936.

The record discloses that Mr. Kessler holds the new Dorothy stock in trust for the noteholders and that voting trust certificates covering the seven new Clemens notes were issued to Mr. Cartall's estate after his death.

Fifteen dollars semi-annual interest is payable on each note. Mr. Colbrunn testified that Mr. Cartall told him to put the New Clemens notes in his wife's name. Apartment Management Company cancelled checks, payable to plaintiff, covering New Clemens interest due, were introduced, viz.: April 1, 1935, $105; October 1, 1935, $465; April 1, 1936, $105; October 1, 1936, $105. The $465 check represented interest on 31 New Clemens notes. Apartment Management Company checks, payable to Mary E. Cartall and covering interest due on the 128 Dorothy notes, were issued as follows: On May 28, 1936, for $1600, representing a partial payment of $12.50; and on July 31, 1936, for $1920—a payment of $15. All interest checks issued during Mr. Cartall's lifetime bear the following endorsements: "Mary O. Cartall," "O. M. Cartall;" and it was stipulated that plaintiff never received any of said interest payments.

Gilmore Bloch, president of Milton K. Lederer & Company, stock and bond dealers, identified two receipts for securities, one dated April 9, 1935, for $2500 Dorothy notes, another, dated April 27, 1935, for $5000 Funston Apts. Each reading: "We hand you herewith the following securities. Kindly acknowledge receipt of this sum and return to us." They were addressed to Mary E. Cartall and were signed: "Mary E. Cartall per O. M. Cartall." A number of like receipts, including $4500 New Clemens notes and 3 shares of New Clemens voting trust certificates, addressed to and signed by "O. M. Cartall," were offered by defendants.

After Mr. Cartall's death the Dorothy and New Clemens notes here involved were found in safe deposit box No. 1470A of the First National Safe Deposit Company, which was opened in the presence of Mr. Kessler, Mr. Hinton, representative of St. Louis Union Trust Company, plaintiff and others. They were not on top of other things in the box nor in any envelope of any kind, but were laid flat, folded once, in the box and had no marks on them at all. The box had been rented May 15, 1935, in the name of O. M. Cartall and while he had deputized plaintiff to enter the box, there was testimony that she had never done so during Mr. Cartall's lifetime. When the box was opened, Mr. Kessler remarked to Mr. Hinton in the presence of plaintiff: "These bonds [speaking of the Dorothy] belong to Mrs. Cartall." Mr. Kessler was of opinion plaintiff did not say anything.

Mr. Hinton mentioned what Mr. Kessler had said and asked plaintiff if she wanted to make any statement. ''She just said she didn't know anything about it.''

The New Clemens and the Dorothy notes here involved were inventoried and appraised as assets of O. M. Cartall's estate in the inventory, subscribed, sworn to and filed of record by plaintiff and M. A. Hinton, agent, coexecutor. The first and second settlements, signed, sworn to and filed (to the September, 1937, and March, 1938, terms of court) by the executors (including plaintiff) of the estate of O. M. Cartall, deceased, account to the estate for the receipt of interest on said Dorothy and New Clemens notes, and show said notes as part of the balance on hand of said estate. This suit was instituted November 12, 1937.

It was stipulated that the Federal income tax return for the year 1935 required the statement therein of any gift exceeding $5000 in value; that Mr. and Mrs. Cartall filed a joint return for said year, and said return answered the inquiry with respect to the transfer or receipt of any such gift: ''No.''

The refinancing of the Dorothy was handled by attorney Newman, who, under date of May 13, 1936, left a memorandum with Mr. Cartall that he had received the Dorothy old notes, the Dorothy new notes, and the Dorothy title. On the reverse side thereof, in Mr. Cartall's handwriting, was the following: ''May 14, 1936. In Mr. E. G. H. Kessler's file (in his office) there are 70M of Dorothy Apt 1st Mtg bonds—of which $64,000.00 belong to me—O. M. Cartall.''

We are concerned with an alleged absolute parol gift *inter vivos* of notes of third parties payable to bearer. We have no issue involving any consideration. The authorities hold there must be a delivery, actual or constructive, of the thing given, with intent to relinquish all dominion thereover, by a donor to a donee to constitute an irrevocable gift *inter vivos*, the requirement of delivery being particularly applicable to parol gifts. Two factors enter into a consideration of delivery. In case of an actual delivery, was the delivery in consummation of the intention to give? If there be an intention to give but no actual delivery, were the acts done a sufficient delivery to consummate the gift? We have no actual or symbolical change of possession in the instant case and, for the purpose of discussing the issue of delivery, assume an intent to give.

Plaintiff asserts that consideration must be accorded the subject of the gift and the relations between the donor and the donee; citing Davis v. Zimmerman, 40 Mich. 24, 27, a case quoted in a number of Missouri cases, including and much like Schooler v. Schooler, 18 Mo. App. 69, 75(2). In these and other cases there was testimony establishing the wife's possession and dominion over the property. Plaintiff's position may be well taken but the time when the gift is first asserted also has a bearing on the issue of delivery.

Stein v. Mercantile Home Bk. & Trs. Co., 347 Mo. 732, 148 S. W. (2d) 570, 572[3], with respect to the probative value of the evidence essential to establish a gift *inter vivos* asserted after the death of the donor by a nephew who was regarded by the donor as his son, states: " 'Clear, cogent and convincing' describes the standard which the testimony must meet to such satisfaction so 'as to leave no room for a reasonable doubt in the mind of the chancellor.' " [Re Franz Estate, 344 Mo. 510, 520[3], 127 S. W. (2d) 401, 404[8], speaking of a gift from children to their mother.]

■ While, as stated by plaintiff, the right of a debtor to pay the debt to a third person is a factor entitled to consideration on the issue whether title has passed to such other, it is not controlling because: Any lack of consideration passing between the original payee and such third person is no defense to the debtor in an action by such third person on the debt. [Roth v. Continental Wire Co., 94 Mo. App. 236, 261(I), 68 S. W. 594, 601(1).] On the other hand, it is elementary that a want of consideration is available to an alleged donor in an action by a purported donee to compel performance of a communicated intention—a promise—to make a gift.

. ■ The Apartment Management Company, for its convenience, and not by reason of any contractual relation between the debtor and creditor, listed the notes upon its records in plaintiff's name upon statements by Mr. Cartall in response to inquiries made of him. [Consult In re Crawford, 113 N. Y. 560, 565, 21 N. E. 692, 693.] Title does not pass by reason of mere statements indicating a gift. [Light v. Graham (Mo. App.), 199 S. W. 570, 572[2-4]; Albrecht v. Slater (Mo.), 233 S. W. 8, 10[1].] Want of consideration is one reason. Mr. Cartall never parted with the possession of the notes. He placed them in his safe deposit box, which plaintiff was deputized to, but did not, enter. Her authority under his deputation terminated at his death. Mr. Cartall's signing receipts addressed to plaintiff covering the delivery of bearer notes and his endorsement of the interest checks payable to plaintiff in the light of his retention of the notes, his receiving the proceeds of the interest checks, and the undisputed inferences (from plaintiff's failure to enter the safe deposit box and from her statement that she knew nothing about the matter), that he must have presented the interest coupons for payment, and that he never told plaintiff of any gift, is not persuasive and convincing evidence of an irrevocable parol gift *in praesenti* from a husband to his wife.

■ There is no legally consummated gift *inter vivos* where the donor reserves, either expressly or in the circumstances, the power of revocation or dominion over the subject of the gift. Mr. Cartall retained dominion over the notes precisely the same as he had had dominion prior to the alleged gift. He could at any moment undo what the witnesses testified he said he had done. An irrevocable

gift is inconsistent with a *locus penitentiae*. The point is not that Mr. Cartall may have been unaware of the legal requirements of a valid gift; and we have no right to supply omissions in the evidence to uphold an alleged gift no matter how appealing the donee's position may be.

■ Albrecht v. Slater (Mo.), 233 S. W. 8, 10[1, 2], was an action by a sister to remove an alleged cloud on real estate held by herself and husband, represented by an $8000 note of herself and husband payable to her brother, secured by a deed of trust on said real estate, on the theory of a gift *inter vivos*. She and her brother had a safe deposit box and each had a key thereto, but she never had seen the box opened until it was opened with her key after her brother's death in the presence of those interested in his estate. A note, addressed to the sister and signed by the brother, was found in the box stating he gave her the amount of $8000 as a present. The sister did not know of this communication. The papers in the box, including the note and deed of trust and the note addressed to the sister were taken in charge by the administrator without the sister asserting any claim or interposing any objection. The sister's son had been authorized to make the interest payments for her and he paid an interest installment soon after the brother's death. Witnesses testified that the brother had stated he had everything arranged, and that the deed was turned over to the sister. The court ■ held there was no sufficient delivery or acceptance to constitute a valid gift. We quote: "In the case of Thomas v. Thomas, 107 Mo. 459, 18 S. W. 27, it is held: 'In order to constitute a valid gift of personal property, it is essential that it be delivered by the donor to the donee, or some one for him, with the *intention* on the part of the *donor to part with his right in and dominion over the subject of the gift, and that it be accepted by the donee, whose ownership must take effect immediately and absolutely,* leaving nothing essential to be done in the future.' (Italics ours.)"

Trautz v. Lemp (Banc), 329 Mo. 580, 605, 46 S. W. (2d) 135, 143[20-22]. Alexander H. Handlan owned 1550 shares of corporate stock and was president of the corporation. In 1917, he had 15 certificates for $100 shares and one certificate for 50 shares issued in his name. These were delivered to him at his office by his son A. H. Handlan, Jr., secretary. He then called his son Edward R. Handlan in, endorsed each new certificate in blank, and wrote upon an envelope: "Sept. 11th, 1916. This is the property of my son E. W. Handlan, given to him for his faithful work for the firm of Handlan-Buck Mfg. Co. A. H. Handlan. The within shares will be deducted from his interest in my estate at face or par value. A. H. Handlan." Similar legends were written upon two other envelopes, one having the name of his son E. R. Handlan thereon, and the other, the name of his son A. H. Handlan, Jr., thereon. The father then separated the

certificates of stock into three lots and enclosed the separate lots in the envelopes. He delivered the envelopes to his son E. W., treasurer of the company, for safe-keeping, who placed them in the company's vault to which he alone had access. After complaint by one of the sons, the father and two sons rented a safe deposit box in which any two had joint access and placed the certificates and other corporate papers therein. The father continued to hold the office of president, draw the salary therefor, and voted the stock. The court held the attempted disposition of the property was testamentary in character and invalid, and that there was no completed delivery of the stock to the sons.

Among other cases holding no delivery had been established of personal property found in safe deposit boxes, which see, are: Bauernschmidt v. Bauernschmidt, 97 Md. 35, 59, 54 Atl. 637, 643; Bolles v. Toledo Trs. Co., 132 Ohio St. 21, 28, 4 N. E. (2d) 917, 918[6, 7]; Dingley v. Robinson, 149 Wash. 301, 270 Pac. 1018; Casey v. Topliffe, 80 Fed. (2d) 543; Mitchell v. Weaver, 242 Mass. 331, 333, 136 N. E. 166[1-3]; Ariett v. Osage County Bank, 120 Kan. 286, 242 Pac. 1018. The cases mentioned presented, we think, stronger evidence of a valid gift than the instant record, as do others; for instance, Light v. Graham (Mo. App.), 199 S. W. 570, 572[2-4]. [See Annotation, 25 A. L. R. 642.]

The cases stressed by plaintiff are distinguishable on the facts.

Harvey v. Long (Banc), 260 Mo. 374, 384(II), 168 S. W. 708, 710(2), written by Brown, C., and stressed by plaintiff, was concurred in by two judges; two judges concurred in the result and three judges dissented. It is not an authoritative or controlling pronouncement of the law by a majority of the court. [State ex rel. v. Daues, 323 Mo. 388, 403, 19 S. W. (2d) 700, 707, 67 A. L. R. 157.] Moreover: Although much of Harvey v. Long discusses an issue of the delivery of a deed conveying real estate to the grantor's wife, the deed having been found in the grantor's desk subsequent to his death, the facts therein stated established that the wife gave the husband a valuable consideration for the conveyance, which is also mentioned in the discussion on delivery (260 Mo. l. c. 381, 383, 389). The remarks in the dissenting opinion, Graves, J., writing, with respect to the husband retaining dominion over the deed are more apropos to a case involving notes payable to bearer.

Dickson v. Dickson, 231 Mo. App. 515, 520, 101 S. W. (2d) 774, 777[8], involved the delivery of a note by a husband to his wife, being an action against the wife to discover assets. The note was endorsed: "Assigned to Emma A. Dickson, without recourse. W. G. Dickson. [Here are credited two interest payments.] At my death this note is to become the property of my wife, Emma A. Dickson." The note was taken from the joint safe deposit box of grantor and grantee, the "assignment" executed, and replaced in the box. The donor

soon thereafter stated to another and again to the donee what he had done and that he had *"left it in the bank vault with her papers."*

Jones v. Jones (Mo. App.), 201 S. W. 557 [1-4]. A bank was organized, the stockholders agreeing none should own more than ten shares. A father took ten shares and had seven additional shares placed on the books and issued to his son. He, as president, sent written notices of stockholders' meetings to the son. This was held to permit of an inference of fact on the issues of a consummated gift.

 Among the facts occurring subsequent to Mr. Cartall's death, attention may be directed to the following: Mr. Cartall's memorandum, dated May 14, 1936, in his own handwriting and over his signature that he owned the Dorothy notes. When the notes were found in his safe deposit box and plaintiff was asked if she wanted to make any statement concerning Mr. Kessler's remark that the notes belonged to her, she replied she knew nothing about it. Thereafter, she joined in executing, swearing to and filing the inventory and appraisal of Mr. Cartall's estate, and the settlements to the September, 1937, and (after the institution of suit) to the March, 1938, terms of the probate court and in each listed and accounted for said notes, interest thereon, etc., as assets of Mr. Cartall's estate. The Federal income tax return of 1935.

 Plaintiff also seeks to hold her judgment on the theory of an express trust. The decree nisi was not based on this theory but upon a finding that the "notes and shares of stock were, by said Otto M. Cartall, given to plaintiff to be her own property. . . ." Plaintiff stresses Re Estate of Soulard, 141 Mo. 642, 659 (III), 43 S. W. 617, 621 (3), and Harris Banking Co. v. Miller, 190 Mo. 640, 663 (II), 89 S. W. 629, 635 (2). We shall not extend the opinion by detailing the facts of those cases, which differed materially from the facts of the instant record. Closely read there was testimony in each indicating a passing of the title and a delivery. In fact, plaintiff's brief states: "In the case at bar, unlike the Soulard and Harris Banking Company cases, there was not expressed by Mr. Cartall any intention to reserve title in himself, or until his death." We quote from Re Estate of Soulard, 141 Mo. l. c. 664, 43 S. W. l. c. 622: "Three things, it has been said, must concur to raise a trust: 'Sufficient words to create it, a definite subject, and a definite object; and to these requisites may be added another, viz., that the terms of the trust should be sufficiently declared.' [Citing authority.]" The declarations attributable to testator, under the instant record, tended to establish an intention to make a gift, unconsummated, in law, at the time of his death. There were no declarations of a trust, transferring equitable titles and creating and defining the interests and powers of the parties. [Elliott v. Gordon, 70 Fed. (2d) 9, 11 [1-6]; Eschen v. Steers, 10 Fed. (2d) 739 (discussing the Missouri cases and law); Citizens Nat. Bk. v. McKenna, 168 Mo. App. 254, 258, 153 S. W. 521, 523 [5,

6]; Mulloy v. Charlestown Five Cents Sav. Bk., 285 Mass. 101, 105, 188 N. E. 608, 609 [4-7]; and cases infra.]

Donors, not the courts, must create voluntary parol trusts, the same as testators must make their wills and living persons must make their contracts. Unexecuted or imperfect parol gifts of personalty are not trusts, nor are executory parol promises for the creation of a voluntary trust. Courts leave such a transaction as the donor left it. "The rule is well established that equity will not give effect to an imperfect gift by enforcing it as a trust, merely because of the imperfection, since to do so would be to give effect to an intention never contemplated by the maker." [Annotations, 96 A. L. R. 384; 123 A. L. R. 1335; Goodman v. Crowley, 161 Mo. 657, 663, 61 S. W. 850, 852; Godard v. Conrad, 125 Mo. App. 165, 174, 101 S. W. 1108, 1110; Pennell v. Ennis, 126 Mo. App. 355, 360, 103 S. W. 147, 148; Perry v. First Nat. Bk., 230 Mo. App. 374, 377, 91 S. W. (2d) 78, 80[5].]. The Soulard (141 Mo. 642, 43 S. W. 617, 621) and Harris Banking Co. (190 Mo. 640, 667, 89 S. W. 629, 636) cases recognize this principle.

Plaintiff never changed her position in reliance upon the alleged gift and the testamentary trust permits of the use of so much of her husband's estate as may be necessary for her proper maintenance and support. During his lifetime, plaintiff had no equity with respect to the alleged gift against her husband. It is difficult to perceive how his death can raise an equity against the disposition he made of his estate in his will.

Other points are presented by defendants. They need not be discussed.

The judgment is reversed, with directions to enter judgment in conformity herewith. ■ *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by Bohling, C., is adopted as the opinion of the court. All the judges concur.